## NEHEMIAH TILTON v. JAMES SYKES.

Court of Chancery. Kent. February, 1819.

*Ridgely's Notebook II, 293.*

*Memorandum of agreement between Doctor James Sykes, Esquire, of the one part and Nehemiah Tilton of the other part.*

Whereas the said James Sykes as Executor of his father, James Sykes, Esquire, deceased, hath a judgment against James Millis, deceased, the principal and interest of which amounts to about twenty eight pounds, and the said Nehemiah Tilton hath a judgment against the said James Millis the balance of principal and interest of which amounts to about five hundred pounds, and whereas the estate of the said James Millis is involved in uncertainty as to the claims and judgments which are justly due from his estate which are antecedent and prior liens thereon to the judgment of the said Nehemiah Tilton. In order therefore to make safe their said claims the said parties hereby agree to become the purchasers of the real property of the said James Millis, deceased, which he had in his possession at the time of his death, or was otherwise bound by their or either of their said judgments, which they may deem low, and can sell again to a profit or credit, and that the said purchases if any shall by them or either of them be made shall be for the common benefit of both the said parties for the discharge of their said judgments and shall or may be sold or otherwise disposed of by them for that purpose, and the balance of such sales after paying prior liens if any, and the judgments of the said James Sykes and Nehemiah Tilton aforesaid, and the charges of counsel, etc. etc. shall be divided between them jointly and equally their executors or administrators. For the true performance of all and singular the covenants and agreements aforesaid according to the true intent and meaning thereof the said parties bind themselves each to the other firmly by these presents. In testimony whereof they have hereunto interchangeably set their hands and seals the third day of February Anno 1803.

(Signed)     *James Sykes*       (Seal)

            *Nehemiah Tilton*    (Seal)

Note that the word *safe* was interlined in this agreement before signing the same. *Test. Henry M. Ridgely.*

And the said James Sykes acting under the said agreement purchased the said sixteen acres as aforesaid for the said sum of £387.

That under said sale said defendant entered into the perception of the esplees of said sixteen acres and took and received all the rents and profits yearly and every year from the said May 7, 1803, until August 24, 1811, when the said land was sold at public auction to Peter Caverly who purchased the same in trust for said defendant for $474 or about that sum. All which said rents and profits so taken by said defendant were converted to his own proper use.

That the said rents and profits received by defendant were of the yearly value of $60 and upwards, and that the annual rental value of said land was during said period more than $60.

That complainant has been always willing and desirous to come to a fair account and settlement with defendant concerning the premises, as well the consideration aforesaid of £387, the purchase money aforesaid and which was in effect applied to complainant's judgment as to rents and profits received by defendant. Complainant requested of defendant a settlement and that he should pay what should be found due on such settlement to him.

Defendant never has come to any account, and never paid to complainant any of the rents and profits, and has refused to account concerning said £387, the purchase money which remained to be adjusted and settled under the agreement aforesaid.

Prayer that said James Sykes may be decreed to come to a fair and just account with complainant in and concerning the premises and to be charged in such account with all and every the sums of money due from said J. S. to complainant according to the matters herein before alleged with interest on said sums respectively from the respective days and times when the same respectively accrued due, and to pay to complainant what shall appear to be due to him on such account and for farther relief.

---

The answer admits the judgment of complainant in Supreme Court against Milliss for £1500, real debt £750, interest from January 1, 1794. That Milliss died intestate and that administration was granted to defendant and Thomas Allen, that Milliss in his lifetime, to wit, April 4, 1795, paid to complainant £45 in part of said judgment and February 16, next following, £300, and May 30, 1798, he delivered to complainant 149¼ bushels Indian corn as by receipts.

*Scire facias* and judgment thereon. *Fieri facias* delivered to Manlove, Sheriff. Return as in bill. *Venditioni exponas.* Sale and return as in the bill.

Defendant says that the land was purchased by him, for himself and complainant in pursuance of an Article of Agreement made between him and complainant February 3, 1803, which are the same that are referred to in complainant's bill.

Defendant insists that by said article it was not intended by the parties that defendant should pay to said complainant any part of said sum (£387) bid for said premises, but that said premises should be again sold by them, and out of the proceeds of the said sale the prior judgments should be discharged, and the balance should be appropriated to the payment of the judgments of this defendant and of the complainant according to their priority, and the balance, if any, should be equally divided between them.

Defendant admits that on February 16, 1804, he took possession of said premises and rented the same for the use of himself and complainant. That the house and garden were rented for the yearly sum of £12, and the lots of grounds for half of the grain raised on them.

That defendant received in the Fall of:

| | | |
|---|---|---|
| 1805 .... | 95¼ | bushels of Indian corn |
| 1806 .... | 72¾ | bushels of Indian corn |
| | 25¾ | bushels of wheat |
| 1808 .... | 73½ | bushels of Indian corn |
| | 21½ | bushels of wheat |
| 1810 .... | 80½ | bushels of Indian corn |
| | 23¾ | bushels of wheat |

being one half of the whole amount of grain raised on said premises and delivered to defendant. That though house and garden were let by defendant for the annual sum of £12, yet he has only received on account of said rents the following sums, to wit:

| | |
|---|---|
| March 24, 1805 | $3.00 |
| October 13, 1807 | 15.06 |
| September 15, 1809 | 25.00 |

and that all the residue of said rent is still in arrear and unpaid. Defendant says:

| | |
|---|---|
| that he has paid the taxes amounting to | $19.30 |
| and has furnished repairs, *viz*, 341 rails at $6 per hundred | 20.46 |
| 93 posts at $0.12½ | 11.62½ |

Admits that judgments prior to those of defendant and the complainant amounted to (£98.2.1) about the sum in said bill mentioned.

That James Sykes, Esquire, deceased, father of defendant in his lifetime recovered against Milliss judgment such as for such amount and as stated in the bill. (April 18, 1787, judgment for £28.14.10, real debt £14.7.5, interest from April 20, 1786.)

James Sykes deceased made will; Agnes and defendant executors. Agnes died.

Said land was sold, in pursuance of said Articles of Agreement, at public sale. Peter Caverly purchased them for this defendant at time in the bill (August 24, 1811) for $460. That James Tilton, Junior, the agent of the complainant his father attended said sale. That defendant August 29, 1811, paid said $460 to said James Tilton as by receipt. Defendant denies that he was unwilling to settle, on contrary wished it. Referred to H. M. Ridgely and Thomas Clayton, but they did not settle. Complainant is indebted to defendant $2 for medicines for which defendant craves a credit. Denies all combination.

(NOTE. As to himself the Sheriff was right, for Dr. Sykes having purchased this land for himself and Mr. Tilton, under the agreement made by Sykes and Tilton, he, the Sheriff, might well apply the £387 to discharge himself from Tilton. But how can that affect Dr. Sykes? The agreement must decide it.)

———

THE CHANCELLOR delivered the following opinion. When this case first came under my consideration, I hastily fell into the opinion that the defendant is answerable for a moiety of £387, the purchase money for the sixteen acres of land and cripple [3] sold by the sheriff to the defendant and complainant on the bid of the defendant on May 7, 1803. I say sold to the defendant and complainant, because that was the effect of the sale and is so to be considered in this court, although the sheriff may have returned on his writ that the sale was made to the defendant. I had, improperly, as I now think, supposed that the defendant, being returned by the sheriff the purchaser, was liable for one-half of the purchase money, and that that sum ought to be charged to him, together with a moiety of the rents and profits; and that whatever balance might be found due by stating the account in this manner and giving him credit for his father's

———

[3] A dense thicket in swampy or low-lying ground was called "cripple." See *New English Dictionary*, ed. by James A. H. Murray (Oxford, 1893), s. v. "cripple," A3a.

judgment and for a moiety of taxes and repairs paid and made by him, the same ·was to be paid to the complainant. In this view of the case, I had considered the plaintiff and defendant as partners in the purchase, and that £387, the purchase money, ought to have been paid by them to the sheriff, and by him applied to the judgments, so that the money arising on the sale made by the sheriff would have been the fund to pay the complainant.

The complainant in his bill claims the £387 totally of the defendant. He says that the whole sales amounted to £811.17.6; that £98.2.1 thereof were applied to prior judgments against Milliss, and that the balance of £713.15.5 were applied by the sheriff to the writ of *venditioni exponas* sued out by complainant against Milliss; but that the defendant never paid £387, a part of said £713.15.5, to the sheriff, and consequently the sheriff never paid it to the complainant; and the bill is now filed to compel the defendant to account, among other things, for the said £387. In this manner he treats the sum of £387 bid by the defendant for the land as a sum that should have been paid by him to the sheriff and applied by the sheriff to his, the complainant's, debt, without any regard to the article of agreement, as if that article could operate on the profits only, to be made by a future sale by the complainant and defendant.

The defendant in his answer insists that it was not intended by the article of agreement that the defendant should pay to the complainant any part of said sum of £387; but that the land and cripple should be sold by them, and out of the proceeds of the sale the prior judgments should be discharged, and the residue should be appropriated to the satisfaction of the judgments of James Sykes, deceased, and of the complainant against Milliss, and that the balance, if any, should be equally divided between them.

I am satisfied, upon a review of this case, that my first impressions were erroneous. The sheriff's return ought to have no weight in deciding the question between these parties. As it regarded him, he was right in making his return so as to apply the £387 to the writ of *venditioni exponas* upon which he sold the land, and thereby discharged himself from the complainant, the plaintiff in that writ. The complainant, by the article of agreement, made himself a party to that sale; and it was fair and right in the sheriff to make such return as to show the whole transaction, and thereby, connecting his sale with the article of agreement, be enabled to defend himself, either at law, or in equity, against any suit which Tilton might prosecute against him for these £387. But as to the question here, we must ex-

amine the article of agreement and decide according to its true meaning. It is by that article that the complainant is entitled to call upon the defendant to account, and not by the sheriff's return. The parties, in purchasing this land and cripple, had two objects in view; first, to make their debts safe; and secondly, to make a profit on their purchase by selling on credit at an advanced price. As the purchase money was all going to them, there was no necessity for them to pay it to the sheriff, and then to receive it from him, and indeed this was not their intention; for it was not from this purchase money, but by a resale of the land, that they expected to obtain their debts and to make a profit.

In the agreement, after reciting their judgments against Milliss and some difficulties in ascertaining the sums due on prior judgments, they determined to purchase low and sell on a profit on credit; and then they declare "that the said purchases, if any shall by them or either of them be made, shall be for the common benefit of both the said parties, for the discharge of their said judgments, and shall or may be sold, or otherwise disposed of by them for that purpose, and the balance of such sales, after paying prior liens, if any, and the judgments of the said James Sykes and Nehemiah Tilton aforesaid, and the charges of counsel etc., etc. shall be divided between them jointly and equally," etc. Now, it [is] here most evident that it never entered the minds of the parties that the sum bid by Dr. Sykes to the sheriff should be paid to him, or applied to either of these judgments, or to any judgment prior to those of Sykes and Tilton. They expressly declare that the land shall be sold or otherwise disposed of by them for the discharge of their said judgments, and that the balance of such sales, after paying prior liens, if any, and the judgments of J. Sykes and N. Tilton, shall be equally divided. If all these judgments were to be repaid by the resale of the land, to whose use, or for what purpose, was Sykes bound to pay the £387 to the sheriff or to this complainant? Even for the satisfaction of prior judgments due to other persons, they never contemplated that any part of the money bid by Sykes should go into the sheriff's hands, much less for the discharge of their own judgments, because for all these purposes a fraud was to be created by reselling the land on credit. So they have expressly declared.

If this is not the true construction of the article, some of the words in it are useless and unmeaning. They say, "and the balance of such sales, after paying prior liens and judgments of Sykes and Tilton, shall be divided between them." Now, how could any balance arise if the judgments mentioned in the

argument were not to be first paid out of the proceeds of sale? It never was the intention that Dr. Sykes should pay the purchase money, be it what it might, and then to sell the land again to pay these judgments. The agreement was made before the sale by the sheriff, and they, deeming the land low, bought it in, that it might be sold or otherwise disposed of to discharge these judgments, or else all the provisions about the resale, paying prior liens, the judgments of these parties, and counsel fees, were made without any object. The fact is that it was a speculating scheme, and the project has failed; but still the case must be decided, not according to the event, but to the true meaning of the parties at the date of agreement.

The rents also must be taken, like the proceeds of sale, as a fund for the payment of the judgments. The purchase was made for the common benefit of both, for the discharge of their judgments, so that all money produced from the land, either by the rents, or by a resale, or by any disposition whatever, must be first applied to the judgments. This was the first object, and to this end our future proceeding must be directed.

I therefore am of opinion that Dr. Sykes is not bound to account to Mr. Tilton for the £387, nor for any part of it, but that he must account for the rents and profits received by him, allowing him first to deduct his father's judgment and the money expended by him for repairs and taxes.